We move to the fifth case this morning, United States v. Jason Proknow. May it please the Court, Counsel. Good morning, Your Honors. My name is Joanna Christensen. I represent the appellant. Voice up, please. Yes. The appellant, Jason Proknow. I noticed the system's not exactly picking everything up. I apologize. Mr. Proknow had a reasonable expectation of privacy in the hotel room that he shared with his girlfriend. Even though he was not technically a registered guest, he was on parole and he was arrested in the lobby. Before I get much further, I'd like to correct one of the factual statements in my brief on page 5, the second line from the bottom. I indicated that Jennifer Van Crevelen made the reservation for the hotel room on Priceline and the district court found that. That's actually not true. Mr. Proknow, and it's in the record, at record docket number 23, attachment 14, is Mr. Proknow's printout from Priceline.com. He used his own e-mail address, his own name, his own credit card, his own Priceline account to book the room. Van Crevelen did, however, register for the room. As far as the expectation of privacy, the district court, of course, held that he did not have one, but the factors are that the defendant exhibits actual subjective expectation of privacy, and it's one that society is prepared to recognize. I think the first factor is fairly easy in this case. He was staying there with his girlfriend on their dog, as it turns out. It's the second one. Spike. Spike. We assert that perhaps this case might have been different if the dog's name had been Fluffy, but Spike, in fact, was not a vicious dog. He was a nice, young Labrador mix. I'll get to that in a minute. The society is prepared to recognize.  and that he was technically an absconder from parole from Wisconsin, and he was currently in Minnesota. This court has recently recognized in the Walton case that even if parolees or supervisees are up to no good, using the quote from Walton, that they still have an expectation of privacy. It may be limited, but it's still an expectation of privacy that gives them the standing to argue that a search is unreasonable. Isn't there some, I think the term is ejected from the hotel? Correct. The correct legal term would be ejected. And it's questionable from the record whether they were ejected. They were not legally ejected under Minnesota law. But the district judge made some findings on that, right? Correct. It's true that the night clerk or clerk, whatever he was, seemed to be kind of at odds with everybody else about what happened. But the district judge made credibility-based findings regarding those events. That makes it pretty tough for Mr. Prock now, I think. Well, I think in some cases it would. In this case, we have a lot of different factors. This is a very fact-intensive case. And the one issue is under the law they were not ejected. And there's the differing testimony from each. There are three hotel people. There's the night clerk, the manager, and then the district manager. The night clerk and the district manager, who the only evidence was through a deposition that he gave in a civil case, neither one of them said that they had asked for Mr. Procknow and his girlfriend to be removed from the hotel. But the manager did say that, did testify to that. They just didn't test? Were they asked that or they just didn't? The question wasn't asked. The question was asked of both of them. And both the district manager and the clerk said that they did not specifically ask the police officers to remove them from the hotel. So I think it's a mixture of law and fact. I think the fact, obviously, because it's a credibility determination about which to believe, the police officers or the hotel manager, or I'm sorry, the clerk and the district manager, that's a credibility finding. But the matter of fact was that they weren't legally ejected. You know, they had paid for the hotel room through the 31st, and he was arrested on the 29th. How about removal of the dog? Is there any question that they were at this point, given the district court's findings, that the officers were asked to remove that dog? Again, there's some credibility issues there between the different testimony, even if they were asked to remove the dog. And this is where the dog's name comes into play. They go up to the room with a dog catcher pole. And I don't know if the court's familiar. It's a long metal pole with a noose on the end to collect dangerous animals. They open the door. They see the young puppy, or it's not a puppy, young dog who approaches them. And they say, well, you know, then we walked in because we needed a leash for this very nice dog that was named Spike, unfortunately. And that's the point where it becomes unreasonable, even if there's a community caretaking function to go get the dog. The dog was not dangerous, was very friendly, came up to them. They didn't need a leash because they had a dog catcher pole. They could have simply pulled the dog, pulled him out of the room, completed their community caretaking function right there. The problem was when they entered the room, which from the pictures in the record was a very messy room, messy hotel room, and there were lots of items, personal and otherwise, strewn about. But they're looking for a leash, they say, because it's a nice dog. They don't want to put the dog on this pole. Well, I understand that the feeling of a dog lover is you don't want to do that. A dog might have a negative reaction to being put at the end of that pole. It's kind of rough handling. That's why they use it for vicious dogs. Right. The dog may have a negative reaction to being put on a leash. My dog does occasionally, and especially by someone that the dog doesn't know, even though he did approach them. So the officers evaluate the situation and then sort of the level of force they're going to use in getting the dog out of the room. Right. So how's that unreasonable? Unreasonable, I think, is not necessarily – it's the act of rifling through everything for a leash. As you're going around like this and not seeing any of the – Well, Your Honor, this is not a case – you know, when I describe this case, most people assume this is a drug and gun case. When they walk in, they see a pile of drugs on the table and there's a gun right next to it. This is not the type of evidence that is relatively visible as illegal. It's paperwork. It's, you know, at least one credit card. And, you know, poor housekeeping does not make a probable cause to search through things to look for it. You know, it was paperwork. They had to actually stop and read it. The credit card was in Prochnow's hand, wasn't it, when he got tased? There was one in his hand. And there was another one in the room? Yes, there was another one in the room. Belonging to someone else. It's unclear whether it was immediately observed that it belonged to someone else. It was observed in a plastic bin. And I don't recall from the record if the police officer, at the moment that he observed it, saw that it was in somebody else's name. I know with the one that was on his person, they did. It was Trevor Koons was the name that the card was on his person. However, the police officers did testify that at the point that he was arrested, if nobody had said anything about the dog, they were not going in the room. So at that point, they knew he had a card from somebody else, and that wasn't enough for them to want to go in the room. So the dog is the key issue here, and whether this court is going to expand the community caretaking to account for dogs, and a dog that's not even in immediate danger or causing immediate danger to someone else, or even property. Well, now wait a minute. The two people that could go into that room, by your argument, are being taken away to jail, and a dog's left there. It seems to me that dog's in some danger. Well, it depends on how long they're going to be gone. And the police don't know at that point. Right. They did arrest Ben Crevelin for harboring, and I believe she bonded out that night. And, of course, they don't know, obviously, that's what's going to happen. So they're to walk away leaving a dog indefinitely in a locked hotel room, as far as they know, alone? That sounds cruel and unusual. You know, again, for dog lovers, yes. I'm sure the hotel wanted the dog out of there. Did the dog ever eat your homework? No, I mean, they really had to. They were responsible for that room. As it turns out, there was a lot of evidence in that room. Well, correct. They had to extricate the dog. They couldn't leave the dog and whatever might be in that room alone. They not only had a caretaking responsibility, but there was also concern about the evidence that might be in the room. I'm not sure that the police officers ever expressed a concern about the evidence in the room. What we know now, I'm sorry. They put evidence tape over the door. After they saw everything. But at the moment when they're asked to go get the dog, they certainly don't know that there's going to be evidence in the room. They are going just to get the dog. They open it up and they think, well, you know, here we go. And they look for a leash. That's the point where it becomes unreasonable in our argument. And it would require this court to extend the community caretaking doctrine, that it's not extended beyond immediate aid. And immediate aid mostly for the safety of people and or police officers, who are also people. That came out the wrong way. But this would extend to an animal. And also then the government, of course, argues inevitable discovery, which is unclear here. I think that's the shakiest argument the government has, because the agent Miller testified that they would have had none of this evidence if they had followed the original trajectory of the investigation. The search amped up that. And the evidence they found was only from that search. So I see that my time is going. I do want to address. This is perhaps an aside. Sure. But why would Procter & Gamble go to Eagan, Minnesota? What was the draw there? Minnesota is nice in August. I mean, I honestly don't know. A little vacation from Wisconsin. I think a little vacation from Wisconsin. It's close to the Mall of America. I think what he did say was that he wanted a little vacation from Wisconsin. Unfortunately, he could have. And the post office box was in Minneapolis? Yes. Yes, he had a post office box in Minneapolis. He was on supervised release? In Wisconsin. Did that prohibit him from going to another state? Yeah, it was state parole, and it did prohibit him from going to another state. So he should have vacationed in Wisconsin, of course, again, with hindsight. But I think ultimately what was established was that he was running this scheme using post office boxes on both sides of the state line. So that could have been part of his motivation as well. I just addressed the civil summonses by the IRS. This is an interesting area of the law. It doesn't come up very often. Basically, the most important issue here is the timeline we see. Mr. Prochnow is arrested on August 29th of 2011. Two days later, the FBI is involved. Now, the thought that this was not a criminal investigation is simply ridiculous. The FBI is immediately involved. Six days later, the criminal division of the IRS takes over and says that they're going to prosecute. Egan police drops all charges against him based on this statement from the IRS. I'm sorry, that was a month later. However, the IRS agent starts issuing civil summonses in May and June of 2012, which is a full nine months later, and just a month or a couple weeks, depending on which summons you look at, prior to the United States attorney saying they're pursuing a criminal investigation and prior to then the IRS requesting a grand jury investigation. The timing is what is in bad faith here. But all this happened, there was no referral to the IRS. Correct. Right, there was no referral. And there is this idea of a bright line rule, and the amendment in 7602 was a bright line rule. However, this court has held since 1982, I guess, when the amendment was made, in Michaud and Peters, that there's still bad faith. There's still a bad faith analysis, because essentially what the IRS can do is hold off on a referral, use the lesser civil summonses to gather evidence, what's clearly a criminal prosecution the entire time. The original agent who was on it, the IRS agent, was head of the criminal division for the IRS. Now he's not part of the DOJ. He's not part of the FBI. But he's still a criminal investigator. And there was absolutely no thought that this was going to be a civil case. Didn't the judge make a finding that the materials received from the civil summonses was either returned or destroyed, and then those were replaced by grand jury subpoenas? Yes, the judge did make that, and I think that that's a correct finding. The problem is, is the bad faith in the very beginning. You know, there's the question of if there were things found from the civil summonses that would not have otherwise been available, then they can go through and then they're like, oh, well, you know, we destroyed that, so it's fine. We'll go ahead and get the same thing through the grand jury. That has been held to be quintessential bad faith, is that loop of, well, we'll just take them back. You know, we'll have a take back, and then everything will be fine. So I see that I am in my rebuttal time, and unless the court has questions, I'd like to reserve. Thank you. Thank you. Ms. Bascom. May it please the court. My name is Galen Bascom on behalf of the United States. I'd like to start with what I think is the cleanest and easiest way of resolving the Fourth Amendment issue, which is that by the time the police officers entered the hotel room, Prochnow and Van Cleveland had been ejected and no longer had any reasonable expectation of privacy, regardless of what the defendant may have had previously. This was a factual finding by the district court that they had, in fact, been ejected, and it was a proper factual finding that Prochnow cannot show is clearly erroneous. The evidence shows that the stay had, in fact, been terminated at that point. Officer Collins, Sergeant Evans, and Adam Sheeler all testified to that effect. The only witness who did not was Chris Schuelke, whose testimony was rejected by both the magistrate judge and by the district court. This matters because the legal consequence of this rightful ejection is that the expectation of privacy was at that point extinguished. As where the stay lapses naturally, the hotel regains at that point control and dominion over the room and the ability to consent and indeed ask for the police officers to enter the room and clear the dog and any remaining occupants. The ejection here was justifiable both under the hotel policy and under Minnesota law because there had been a disturbance. I think your opponent argues that this is really a mixed question of both fact and law on ejection. Do you agree with that, that it's mixed? Not exactly, Your Honor. Whether there was an ejection affected is a question of fact. Whether what the effect was, the elimination of the expectation of privacy, is a conclusion of law that flows from that factual finding. Now, if the ejection didn't comply with the requirements of ejection under Minnesota law, does that change the determination? We believe that the ejection has to be justifiable, but although defendant argues that the ejection here was in some way unlawful, the requirement that the payment be refunded is, if anything, an ancillary duty. And in this case, the reservation was made through Priceline and any refund would have to go through Priceline at any event. At a minimum, it was reasonable for the officers to believe that the hotel at that point had the authority to consent to the search of the room. And all of this goes back to the reasonable behavior of the police officers when they entered the room and when they saw in plain view the incriminating evidence, they sealed the room and they went and got a warrant out of an abundance of caution. Didn't they take photographs before they sealed the room? They did. Officer Resney still had his camera on him because he had been photographing the scene in the lobby after Prochnow attempted to flee from the police officers. But this was perfectly reasonable because Officer Resney was simply attempting to document what was seen in plain view upon entry. He described the evidence as jumping right out at them. But in any event... What was that evidence? What did they see? So they saw a number of forms and financial paperwork, both tax returns and plea application forms. That was the Professional Legal and Economic Associates. They also saw this credit card in the name of Smith, which was visible through the plastic casing in the room. There was also a typewriter and a flash drive, I believe, on the bed. So all of this evidence was strewn throughout the hotel room. And the police at that point, even though they were operating under the rightful consent of the hotel, also sealed off the room and got a warrant just to make sure that everything was cleaned up. You're saying the Smith was visible through the plastic and was in an envelope? It was in a plastic carrying case, I believe one of the pictures in the record shows, and the name was visible through the clear top. So this ejection was justifiable, eliminating any reasonable expectation of privacy he may have had to begin with. But he also never had a reasonable expectation of privacy. He was a fugitive absconder who was intentionally and unlawfully attempting to conceal his presence at the hotel. This was in violation of the hotel's policy, and it was in violation of the Minnesota statute. Society simply is not prepared to recognize as reasonable the expectation of privacy that a fugitive has when he is attempting to hide out from the police who are trying to apprehend him. So because he was a fugitive absconder, he had no reasonable expectation of privacy to begin with. And because the hotel had regained dominion and control over the room, they also had the authority to consent to the search. I would just like to touch on the community caretaking exception because it was discussed at length. Defendant postulates a number of other ways that the police may have behaved, but the police behavior here was clearly reasonable. They were simply responding to the hotel's request. They were safeguarding the dog. They were safeguarding the employees. And finally, I would also like to touch on the civil summons issue, which defendant makes much of. Defendant is asking for a remedy to which he is not entitled based on a violation of a statute, an alleged violation of a statute that does not entitle him to suppression. Moreover, because the evidence was returned or destroyed, there is simply nothing to be done. And because the proc now alleges taint but shows nothing to prove it. So for all of the aforementioned reasons, unless your honors have any questions remaining about any of the issues, we respectfully submit. Thank you, counsel. Thank you. How much time? You have one minute. Tim. Take a little longer if you need it. Okay. Thank you. I'd like to point out that if one were to walk into my hotel room right now, where all of my property still is from traveling yesterday, you would find my computer, a flash drive, several files with different people's names on them because I represent several different people.  I don't bring my dog with me when I argue. However, seeing these things, walking in a hotel room, does not automatically mean that I am up to no good. In fact, I'm up at the behest of the court and working on my cases. So you're not on parole. You're not on release. Not that I'm aware of. The other issue I wanted to check on is the ejection. It's a little unclear what the legal reason that they're relying on the ejection is. If it's the arrest that they were ejected for, that doesn't necessarily mean that he's lost his privacy interest in the room. The hotel asked for him to be removed but followed none of the formal ejection policies that are in place. And if it's the failure to register, that doesn't always result in an ejection, certainly in most cases. About the civil summons issue, the government argues simply that we're not entitled to the remedy that we're asking for. But this court has held that the remedy is suppression. And UTEC, and I believe in Pacal, held that. And Michaud actually sent back for further findings. So it's a little different of a case. But it was a remedy that was given in all of those cases. I see I'm out of time. I ask the court to reverse and remand for further proceedings. Thank you. Thank you, counsel. Thanks to both counsel. The case will be taken under advisory.